IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RODOLFO NUDELMAN, MD, § | | |
| Plaintiff, § | | |
| § | | |
| V. § | CIVIL ACTION NO. 20-1327 | |
| § | | |
| GC LABTECH, INC., and GCAM INC., § | | |
| Defendant(s). § | JURY REQUESTED | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**MAY IT PLEASE THE COURT::**

Rodolfo Nudelman, MD, ("Plaintiff" or "Dr. Nudelman"), complains of and about GC LABTECH, INC., and GCAM INC., ("Defendants"), alleging and stating claims or relief as follows:

**NATURE OF ACTION JURISDICTION AND VENUE**

1.  This is an action under *Title VII of the Civil Rights Act of 1964, 42 U.S.C 200e et sq, as amended, 42 U.S.C. 1981, as amended, Chapter 21 of the Texas Labor Code, Section 21.001 et. seq. Texas Labor Code, as amended, and Texas Common Law*, to correct unlawful employment practices on the basis of gender, sexual orientation, national origin, and religion, as well as breach of contract.

2.  Venue is prescribed pursuant to 28 U.S.C. §1391 and properly lies in the San Antonio Division of the Western District of Texas. Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §1367 because Plaintiff's claims under the laws of the United States that they form part of the same case or controversy under Article III of the United States

Constitution. Additionally, this county is the county of Defendant, GC Labtech, Inc.'s principal place of business located at 485 Spencer Lane, Balcones Heights, Texas 78201.

3.      This Court has personal jurisdiction over GC Labtech, Inc. because Defendant is a domestic corporation organized and existing under the laws of the State of Texas. Furthermore, Plaintiff would show that Defendant GCAM Inc. is a foreign corporation registered in Texas and has engaged in activities constituting business in the state of Texas as provided by Section 17.042 of the Texas Civil Practice and Remedies Code.

4.      The Court has jurisdiction over this case in that the amount in controversy exceeds the minimum jurisdictional limits of this Court.

## PARTIES

5.      Plaintiff, Dr. Rodolfo Nudelman, is an individual who resides in Bexar County, San Antonio, Texas.

6.      Defendant, GC Labtech, Inc., is a Domestic For-Profit Corporation organized under the laws of the State of Texas, and service of process on the Defendant may be effected pursuant to sections 5.201 and 5.255 of the Texas Business Organizations Code, by serving the registered agent of the corporation, Lawyer's Aid Service, Inc., at 505 West 15th Street, Austin, Texas 78701.

7.      Defendant, GCAM, Inc., is a Foreign For-Profit Corporation and may be served with process by serving the registered agent of the corporation, Lawyer's Aid Service, Inc., at 505 West 15th Street, Austin, Texas 78701.

## CONDITIONS PRECEDENT

8. All conditions precedent to the institution of this lawsuit have been fulfilled. This suit is filed within 60 days after the date a notice of the right to file a civil action was received by Plaintiff and is brought within two years of the date the complaint relating to the action was filed.

## FACTUAL BACKGROUND

9. Plaintiff is an adult, male Hispanic and currently lives in San Antonio, Texas. Plaintiff was born and raised in Argentina and is of Hispanic and Jewish heritage.

10. Dr. Nudelman is a pathologist and has extensive experience in Blood Bank and Transfusion Medicine. Plaintiff worked at GCAM as a medical director from 2013-2015.

### GCAM, INC.

11. GCAM, Inc. ("GCAM") is an affiliate company of GC Pharma (formerly known as Green Cross Corporation), which became the first company in South Korea and the sixth company in the world to establish a plasma fractionation plant in 1971. GCAM is affiliated with Green Cross South Korea, which was founded in 1967 and is one of the largest employers in Korea. GCAM is one of the leaders in the manufacturing and sales of medicine and medical supplies in Asia and are the first in Korea's pharmaceuticals industry to export over $200 million. Their vision is to become 'A global leader in the healthcare industry."

12. GCAM and GC Pharma are a part of the Green Cross Holdings Corporation, which manufactures medicines and medical supplies. The company products include blood derivatives, vaccines, prescription drugs, cerebrovascular disease treatment medicines, and hunter syndrome drugs, as well as recombinants, fibrinolytic agents, and herbal medicine. Green Cross Holdings was founded in 1967 and is headquartered in Yongin, South Korea. Green Cross specializes in the development and commercialization of vaccines, plasma-derivatives, recombinant proteins, and therapeutic antibodies for use in the fields of oncology and infectious disease. GCAM was

established to secure a stable supply of plasma as raw material for plasma fractionation products and enter the U.S. market according to the global strategy of Green Cross.

13. GCAM is the U.S. branch of the international organization, Green Cross, that specializes in the plasma industry. GCAM operates multiple blood plasma collection and donation centers across the United States, and provides a pleasant, relaxing environment for donors and focuses on donor safety and satisfaction. Plasma is collected by a process called Plasmapheresis: a sterile, self-contained, automated process, which separates plasma from the blood that has been drawn and collects it in a bottle. The uncollected parts of the blood, including red blood cells and white blood cells, are returned to the donor. This process allows the donor to donate up to two times a week because they do not have to replenish the parts of the blood that are returned to them.

14. Plasma donated at GCAM plasma donation centers is used to produce medicines to treat or prevent serious diseases and conditions in multiple therapeutic areas: pulmonology, hematology, immunology, neurology, infectious diseases, and shock and trauma. Many of these conditions require regular and lifelong treatment with plasma-derived medicines. GCAM's facilities are licensed and regulated by the Food and Drug Administration (FDA), and both Federal and State agencies routinely inspect the centers. GCAM produces approximately 500,000 liters of plasma annually that meets FDA facilities and quality standards and in turn supply this to the biopharmaceutical company, Green Cross, headquartered in Yongin, South Korea.

**GC L**ABTECH **I**NC.

15. On or about 2015, the CEO of GCAM, Min Su Son, contacted Plaintiff and asked him to help the company create a brand new laboratory to test the plasma collected at GCAM's centers, or words to that effect. The new laboratory that Plaintiff helped create and build from scratch is now called GC LabTech Inc. ("GC Labtech").

16. On or about September 1, 2016, Plaintiff entered into the Corporate Consultant Services Agreement ("the Contract"), a written contract with Defendant GC Labtech. Plaintiff agreed to provide consulting services to GC Labtech, including but not limited to providing information to aid in the initial set-up and opening of GC Labtech's laboratory ("the Lab"), ensuring that the Lab is able to obtain FDA licensure, help establish job descriptions, and aid in the selection of equipment. As consideration for the services performed by Plaintiff, GC LabTech agreed to pay Plaintiff at the rate of $1,500.00 per month for the first ten hours and $150.00 per hour over ten hours per month.

17. Plaintiff recommended James Brian Clark for the General Manager position of GC LabTech, whom Plaintiff has known for years. After Mr. Clark accepted the position, his salary increased by over 50% and he helped build the Lab.

18. The Lab was fully operational in testing the plasma collected at GCAM centers and had passed the United States, European, and Korean inspections, among others such as the FDA and College of American Pathologists.

19. Chris Black-Rodriguez is the laboratory supervisor at GC LabTech. Plaintiff met with Chris Black-Rodriguez every week after Plaintiff's work was done to inform him about lab operations. Chris Black-Rodriguez is an openly homosexual man whom frequently discussed his sexual choices with coworkers at the Lab.

PLAINTIFF'S RELIGION AND NATIONAL ORIGIN

20. Chris Black-Rodriguez harassed Plaintiff because of his religion – that being Jewish. Chris Black-Rodriguez publicly shouted discriminatory remarks like, or to the effect of, "death to all Jews" in both English and German, while raising his right arm in the Nazi salute in the middle of the laboratory with Brian Clark, the Director of Operations, as a witness. Furthermore, Chris Black-Rodriguez constantly mocked Plaintiff's heritage and his national origin – that being

Argentinean, Hispanic and Jewish – such as his accent. All of Chris Black-Rodriguez's conduct was unwelcome.

### PLAINTIFF'S GENDER

21. Throughout Plaintiff's employment, Chris Black-Rodriguez would initiate jokes of a homosexual nature. Plaintiff expressed discomfort when these events would occur with Brian Clark, the Director of Operations. Brian Clark chose not to investigate or stop this activity.

22. Chris Black-Rodriguez physically assaulted Plaintiff in the workplace. Chris Black-Rodriguez grabbed Plaintiff's breast twice without his consent and made Plaintiff feel very uncomfortable. Chris Black-Rodriguez asked Plaintiff to engage in sexual relations with him, which were rebuffed by Plaintiff, and repeatedly turned normal laboratory conversation into sexual innuendos directed at Plaintiff.

23. Chris Black-Rodriguez constantly denigrated Plaintiff by calling him "bitch," "cunt," and other insults at work and during Laboratory Quality Meetings in front of management. Chris Black-Rodriguez accused Plaintiff numerous times about being on "crack" or other drugs when he disagreed with Plaintiff's proposals and/or decisions.

24. On or about October 3, 2019, Chris Black-Rodriguez and Dr. Nudelman exchanged a series of text messages wherein the parties joked about running for president in 2024 and laughably tossed ideas around for their future campaign and platform. Plaintiff sent a text to Chris asking if he wanted to be Plaintiff's vice president and the "first openly gay vice" president. Chris responded by saying, "Fuck yeah . . . except we have to get you fake documents since you are not a natural born citizen" and that Chris "can spread the gay agenda." The jokes and entertainment about their campaign lasted from 6:50 p.m. to 9:30 p.m. via text message.

25. On or about October 18, 2019, Plaintiff texted Chris Black-Rodriguez a photo of a shirt with the words "gay agenda" printed on the front of the shirt and asked "is this your agenda?"

Chris Black-Rodriguez responded, "Fuck yeah… I totally need that shirt lol." Chris Black-Rodriguez did not take express any offense to Plaintiff's text message, but rather welcomed the conduct and continued with the "gay" jokes via text message with Plaintiff.

26. On or about November 2019, GC Labtech sent Plaintiff a contract for his services as a Medical Director, which superseded and replaced the current agreement between the parties.

27. On or about December 8, 2019, Plaintiff sent a text message to Chris Black-Rodriguez that continued the previously welcomed "gay agenda" joke that Mr. Black-Rodriguez had originally started in October. Plaintiff was confused after being attacked and insulted by a homosexual man in HEB and after seeing paintings reading "heterosexual" as an insult. Plaintiff texted Chris, "weird question: does the gay agenda include random acts of violence or intimidation towards heterosexuals?" Chris Black-Rodriguez responded that the text message was "offensive, unprofessional, and vile." Plaintiff responded to Chris by saying to "copy HR please" and apologized to Mr. Black-Rodriguez as he thought he had a friendly relationship with Mr. Black-Rodriguez. Interestingly enough, Chris Black-Rodriguez voiced no concerns whatsoever to either Dr. Nudelman or Human Resources about any unwelcome conduct from Dr. Nudelman. Chris Black-Rodriguez opened the door and started the sort of sexually oriented banter that he later asserted was objectionable.

28. On or about December 13, 2019, Plaintiff went to the Lab to sign the renewal contract and instead, James Brian Clark, the Director of Operations, gave Plaintiff a notice of termination of the Corporate Consultant Service Agreement between Plaintiff and GC LabTech. In a strange turn of events, Defendant alleged that Plaintiff made unwelcome comments, which is patently false. Mr. Clark told Plaintiff that the termination was due to a text sent by Plaintiff to Chris Black-Rodriguez.

29. Plaintiff advised Chris Black-Rodriguez to discuss his false allegations with Human Resources. Plaintiff went to Human Resources and explained to them Chris Black-Rodriguez's pattern and practice of unwelcome comments, offensive comments, and unwanted touching. Instead of investigating Plaintiff's complaint, Human Resources decided to have Plaintiff terminated.

30. On or about February 7, 2020, Plaintiff filed a charge of discrimination with the San Antonio Field Office of the U.S. Equal Employment Opportunity Commission, alleging that Plaintiff was discriminated against because of his gender, national origin, and religion. A dismissal and Notice of Rights was issued on or about August 14, 2020 and received on or about August 17, 2020.

## CAUSES OF ACTION

## COUNT I

**Discrimination – Gender/Sexual Orientation**
**Violation of**
**Title VII of the Civil Rights Act of 1964  42 U.S.C. § 2000e *et seq* , as amended**
**and**
**Texas Labor Code, Section 21.001 *et. seq.***

31. Plaintiff incorporates by reference the facts and allegations set forth above as if the same were fully set forth herein.

32. Defendant, GC Labtech, Inc., by and through Defendant's agents, intentionally engaged in unlawful employment practices involving Plaintiff because he is a male.

33. Defendant, by and through Defendant's agents, sexually harassed Plaintiff, as described above, in violation of his rights under the Texas Labor Code section 21.051. Defendant, GC Labtech, Inc., knew or should have known of the harassment, yet failed to take prompt remedial action.

34. The employment practices of Defendant, GC Labtech, Inc., by and through Defendant's agents, specifically James Brian Clark and Chris Black-Rodriguez, had a disparate and adverse impact on Plaintiff because Plaintiff is a male. Such employment practices were not job-related and were not consistent with business necessity.

35. Defendant, GC Labtech, Inc., by and through Defendant's agents, discriminated against Plaintiff in connection with the compensation, terms, conditions and privileges of employment or limited, segregated or classified Plaintiff in a manner that would deprive or tend to deprive him of any employment opportunity or adversely affect his status because of Plaintiff's gender and or sexual orientation in violation of the Texas Labor Code, Title VII of the Civil Rights Act.

36. Plaintiff alleges that Defendant, GC Labtech, Inc., by and through Defendant's agents, discriminated against Plaintiff on the basis of gender and or sexual orientation with malice or with reckless indifference to the state-protected rights of Plaintiff. Plaintiff suffered damages for which Plaintiff herein sues.

## COUNT II

### Discrimination – National Origin
### Title VII of the Civil Rights Act of 1964  42 U.S.C. § 2000e *et seq* , as amended
### and
### 42 U.S.C 1981 as amended
### and
### Violation of the Texas Labor Code, Section 21.001 *et. seq.*

37. Plaintiff incorporates by reference the facts and allegations set forth above as if the same were fully set forth herein.

38. Defendants, by and through Defendants' agents, intentionally engaged in unlawful employment practices involving Plaintiff because of his national origin (Argentinean).

39. The employment practices of Defendants, by and through Defendants' agents, specifically James Brian Clark and Chris Black-Rodriguez, had a disparate and adverse impact on Plaintiff

because of his Argentinean national origin. Such employment practices were not job-related and were not consistent with business necessity.

40. Defendants, by and through Defendants' agents, discriminated against Plaintiff in connection with the compensation, terms, conditions and privileges of employment or limited, segregated or classified Plaintiff in a manner that would deprive or tend to deprive him of any employment opportunity or adversely affect his status because of Plaintiff's Argentinean national origin in violation of the Texas Labor Code, Title VII and 1981.

41. Defendants, by and through Defendants' agents, classified Plaintiff in a manner that deprived him of an equal employment opportunity that was provided to employees similarly situated in violation of the Texas Labor Code, Title VII and 1981.

42. Plaintiff alleges that Defendants, by and through Defendants' agents, discriminated against Plaintiff on the basis of national origin with malice or with reckless indifference to the state-protected rights of Plaintiff. Plaintiff suffered damages for which Plaintiff herein sues.

## COUNT III

### Discrimination – Religion
### Title VII of the Civil Rights Act of 1964  42 U.S.C. § 2000e *et seq* , as amended

### and
### Violation of the Texas Labor Code, Section 21.001 *et. seq.*

43. Plaintiff incorporates by reference the facts and allegations set forth above as if the same were fully set forth herein.

44. Defendants, by and through Defendants' agents, intentionally engaged in unlawful employment practices involving Plaintiff because of his religious observance, practice, or belief. At all material times, Defendants could reasonably accommodate Plaintiff without undue hardship to the conduction of Defendants' business.

45. The employment practices of Defendants, by and through Defendants' agents, specifically James Brian Clark and Chris Black-Rodriguez, had a disparate and adverse impact on Plaintiff because of his religious observance, practice, or belief.

46. Defendants, by and through Defendants' agents, discriminated against Plaintiff in connection with the compensation, terms, conditions and privileges of employment or limited, segregated or classified Plaintiff in a manner that would deprive or tend to deprive him of any employment opportunity or adversely affect his status because of Plaintiff's religion in violation of the Texas Labor Code and Title VII.

47. Defendants, by and through Defendants' agents, classified Plaintiff in a manner that deprived him of an equal employment opportunity that was provided to employees similarly situated in violation of the Texas Labor Code z and Title VII.

48. Plaintiff alleges that Defendants, by and through Defendants' agents, discriminated against Plaintiff on the basis of religion with malice or with reckless indifference to the state-protected rights of Plaintiff. Plaintiff suffered damages for which Plaintiff herein sues.

## COUNT IV

### Breach of Contract

49. Plaintiff incorporates by reference the facts and allegations set forth above as if the same were fully set forth herein.

50. Plaintiff and Defendants had a valid and enforceable contract. Plaintiff performed and tendered performance of his obligations under the contract.

51. Defendant agreed to renew their contract with Plaintiff for his services as the Medical Director and terminated the contract the day Plaintiff showed up to sign the contract.

52.   Defendants' breach caused Plaintiff injury and damages. Plaintiff suffered damages for which Plaintiff herein sues.

## ATTORNEY'S FEES

53.   Request is made for all costs and reasonable and necessary attorney's fees incurred by or on behalf of Plaintiff herein, including all fees necessary in the event of an appeal of this cause, as the Court deems equitable and just, as provided by Chapter 38 of the Texas Civil Practice and Remedies Code. and Title VII of the Civil Rights Act, 1981 and Texas Lab Code as cited herein

## JURY DEMAND

54.   Plaintiff demands a trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, DR. RODOLFO NUDELMAN, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants for the following:

A.   Defendants take nothing as against Plaintiff;

B.   Plaintiff be granted judgment against Defendants for actual and/or economic damages in an amount not to exceed the jurisdictional limits of this Court, representing but not limited to wage payments, past and future, vacation pay, bonuses, overtime, health care benefits, inconvenience, loss of enjoyment of life, other non-pecuniary losses, and all of the compensation due to Plaintiff that accrued at the time of the filing of this Petition, plus interest at the legal rate from the date each payment became due until the date of judgment;

C.   compensatory damages as requested herein above, in an amount within the jurisdictional limits of the Court;

D.   attorney's fees as requested herein above;

E. pre-judgment and post-judgment interest at the highest legal and/or contractual rate allowed by law;

F. costs of court; and

G. such other and further relief, general and/or special, at law and/or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

By: */s/Glenn D. Levy*
Glenn D. Levy
State Bar No. 12264925
glenn@glennlevylaw.com
Glenn@glennlevylaw.com
**ATTORNEYS FOR PLAINTIFF
DR. RODOLFO NUDELMAN**